**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| FRANK U. WETMORE,<br><br>Plaintiff<br><br>v.<br><br>MACDONALD, PAGE, SCHATZ,<br>FLETCHER & COMPANY, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Docket No. 2:06-CV-00026-GZS |

**<u>DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT JOHN GURLEY</u>**

Defendant Macdonald, Page, Schatz, Fletcher & Company, LLC (hereinafter "Macdonald Page"), by and through counsel, moves for an order excluding Plaintiff's expert John Gurley from testifying in the trial of this matter. The grounds for this motion are set forth below in the following memorandum of law.

**<u>DAUBERT STANDARD</u>**

The Supreme Court has imposed a gate keeping obligation on trial judges with respect to expert testimony or evidence, requiring that trial judges "ensure that any and all scientific testimony or evidence admitted is not only relevant (or helpful), but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). To ensure that all expert testimony or evidence is reliable, the *Daubert* Court referred to Fed. R. Evid. 702, which states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Pursuant to *Daubert* and its progeny, expert testimony must satisfy three requirements to survive a Rule 702 challenge: (1) the expert must be qualified; (2) the expert's testimony must be

reliable; and (3) the testimony must "fit" the facts of the case. *United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995). The "fit" requirement refers to the necessity of a connection between the expert's testimony and the facts of the case. *See Grimes v. Hoffman-LaRoche, Inc.,* 907 F.Supp. 33, 35 (D.N.H. 1995). Thus, it is the court's responsibility to assure that the opinion is properly grounded in fact. *See Vadala v. Teledyne Indus., Inc.*, 44 F.3d 36, 39 (1st Cir. 1995).

In *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137 (1999), the Supreme Court expanded the holding of *Daubert* and held that the reliability analysis is not limited to the four factors outlined in *Daubert.*

> The test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or to every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.

*Id.* at 141. The Court further stated that the purpose of the requirements "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152.

It is the proponent of the challenged expert who carries the burden of proof by a preponderance of the evidence to show that the challenged expert can withstand a *Daubert* analysis. *See Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998); *see also Bourjaily v. United States*, 483 U.S. 171 (1987).

When an expert's opinions are not grounded on a strong factual basis, those opinions can and should be excluded from evidence because they are speculative, unreliable, and/or do not fit the facts of the case. *Kemp v. Tyson Seafood Group, Inc.*, 2000 WL 1062105, 55 Fed. R. Evid. Serv. 994 (D.Minn. 2000) (excluding expert opinion that was "untethered to a competent factual premise"); *Blue Dane Simmental Corp. v. American Simmental Assoc.*, 178 F.3d 1035, 1041 (8th

Cir. 1999) (excluding expert testimony that failed to consider all independent variables that could affect the conclusion); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.2d 1039, 1057 (8th Cir. 2000) (when indisputable record facts contradict an expert's opinion, the opinion cannot sustain a jury's verdict). For example, the failure to consider the lack of a non-compete clause between companies can make an expert's opinion unreliable and speculative. *See Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir. 2001) (expert failed to consider that agreement between Children's and ABC Disney did not include a non-compete clause, and, although the existence of a competing radio company was relevant to value, the expert failed to consider the effect of competition).

## DISCUSSION

### A. Mr. Gurley Made Fundamental Errors In His Methodology And Failed To Consider Relevant Facts.

Mr. Gurley's expert work and report contains numerous mistakes that are fatal under a *Daubert* analysis. Moreover, Mr. Gurley failed to follow accepted guidelines in conducting a business valuation, such as his failure to conduct a thorough and objective investigation and to conduct a site visit. Mr. Gurley only interviewed one employee of the company, who ironically happened to be the Plaintiff himself, without independently checking what he said and after knowing that the employee was bringing a lawsuit. What is more, Mr. Gurley failed to consider facts vital to a competent valuation, such as the fact that the key employees of the company did not have employment contracts or non-competition agreements and the fact that the company was involved in serious litigation at the time of the appraisal.

### 1. Mr. Gurley Failed To Interview Any Employee Other Than Frank Wetmore, An Interested Party.

As of the date of the valuation, Portland Shellfish was a company in South Portland. Jeff Holden was the President of the company and in charge of the company's daily operations. Frank Wetmore was the CEO, but he was removed from the day to day operations, and his office was in Marblehead, Massachusetts. In coming to his valuation conclusions, Mr. Gurley only interviewed Frank Wetmore. Gurley depo at 51: 18-20.[1] He never spoke to Jeff Holden or any other employee. Gurley depo at 51: 14-17.

In completing an appraisal, it is critical for the appraiser to get complete and unbiased information. Objectivity is the hallmark for a competent business valuation. An appraisal loses its objectivity if the appraiser relies only on an interested party and fails to make efforts to speak to the most critical persons.[2] Here, by the time Gurley was ever hired by Wetmore, Wetmore had his sights set on suing Macdonald Page, he had an interest in Gurley's appraisal being as high as possible, and Gurley knew that Wetmore was not a disinterested observer. Since Gurley knew it was his task to forecast the future of Portland Shellfish, it was a sham for Gurley to rely heavily on Wetmore for information. Rather, Mr. Gurley blindly relied on representations made to him by Mr. Wetmore, without getting objective information, including the instances cited below.

---

[1] The Gurley deposition transcript is attached to Defendant's Statement of Undisputed Material Facts as Exhibit B.

[2] When an expert fails to employ the intellectual rigor expected of persons in his field or when the expert loses his objectivity, those opinions may be excluded as unreliable. For example, in *Rowe Entertainment, Inc. v. The William Morris Agency, Inc*., 2003 WL 22124991 (S.D.N.Y. 2003), the court criticized the expert for coming to conclusions based solely on information from the plaintiffs rather than independent study. The court further stated that the expert's failure to verify the information from the plaintiffs made his opinions "undependable." *Id*. at *4. The court stated that "any expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply." *Id*. at *3. Likewise, in *Supply & Building Co. v. Estee Lauder International, Inc.*, 2001 WL 1602976, 57 Fed. R. Evid. Serv. 1309 (S.D.N.Y. 2001), the court excluded an expert who "based his report on his client's unrealistic assurances rather than available records" because there was an insufficient factual basis for the opinions, making the expert's opinion unreliable.

First, Mr. Gurley testified that although company sales decreased in 2001 and in 2002, there was an indication that the sales were moving back up. Mr. Gurley based that entire opinion on "discussions with Mr. Wetmore." Gurley depo at 105: 6 - 106: 12.[3]

Second, Mr. Gurley decided to exclude 1998 from the averages because he concluded that Portland Shellfish was still a "start up" at that point in time, and in coming to that conclusion, Mr. Gurley simply relied on "discussions with Mr. Wetmore." Gurley depo at 120:23-121:5. However, this conclusion does not make sense because the company had sales of $8,437,000 in 1998, had profits of $213,000, had been in business since 1993, and was in its second year of profitability. If Mr. Gurley had taken 1998 into account in the averages, his valuation would have been far lower.

Third, if Mr. Gurley had made the effort to speak to Jeff Holden, he would have found out much valuable information, such as the following: (a) none of the critical employees of the company had employment agreements or non-competition agreements, (b) Mr. Holden would not agree to a non-competition agreement under any circumstances and he was adamant that he would remain in the seafood industry and he would compete with Portland Shellfish if he did not own it, and (c) the company was involved in expensive and serious litigation in California.

Fourth, if Mr. Gurley had spoken to Mr. Holden, he would have realized that Mr. Holden was a key person to the success of the company. Accordingly, Mr. Gurley would then have applied a key person discount to the value of the company.[4]

---

[3] It is also notable that Mr. Gurley chose a valuation date (12/31/2002) that was six months later than the Macdonald Page valuation date (6/30/2002). This is particularly noteworthy because Mr. Gurley testified that the Company's sales and profitability improved during the latter part of 2002, allowing him to assume even greater profits for the following year, but his only source for this information was Mr. Wetmore. Gurley depo at 103:18 - 106: 12.

[4] It is interesting to note that the plaintiff's other expert, Stanley Feldman, recognized that there was no mention of key personnel in Mr. Gurley's appraisal, and he therefore assumed incorrectly that the presence or absence of key personnel "wasn't material to the valuation of the company." Feldman depo at 70: 13-23 (attached hereto as Exhibit 1). However, it is very apparent that Mr. Holden's presence was extremely material to the valuation of the company. Indeed, if Mr. Holden would agree to a noncompete or employment agreement, Mr. Wetmore was willing to buy Holdens' shares as though the company was worth $3.125 million, but without Mr. Holden, Mr. Wetmore refused to

### 2. Mr. Gurley Failed To Conduct A Site Visit.

Mr. Gurley admits that he did not conduct a site visit of the operations of Portland Shellfish. Gurley depo at 66: 23-25. He did not offer any good excuse for why he failed to do one. Gurley depo at 67: 5-18.

Mr. Gurley admits, however, that it is a generally accepted practice and a preferred procedure within the business valuation profession to conduct a site visit as part of a business valuation. Gurley depo at 67:1-4. Indeed, it is the routine conduct for business appraisers to conduct a site visit and meet with members of management. Bravo report at 8 (attached hereto as Exhibit 2). It is important to do this to enable "the appraiser to become better informed about a company's operations, facilities, equipment, labor pool, etc." *Id*. By failing to conduct a site visit, Mr. Gurley did not follow the accepted practice of an appraiser and he failed to show the necessary objectivity of a dispassionate appraiser.

If Mr. Gurley had conducted a site visit, he likely would have learned several things that would have depressed his valuation of the company. First, he would have learned how critical Jeff Holden was to the value of the company. Second, he would have learned of the extremely tenuous relationship the company had with its landlord, including the fact that the company had no lease. Third, he would have learned about the company's need for capital expenditures. Indeed, it was completely inappropriate for Mr. Gurley to assume that the capital expenditures of the company would only be $100,000 per year, especially in light of the condition of the equipment and the fact that in the three years previous to the valuation, the capital expenditures had been $124,085, $110,502, and $274,574. Finally, he would have learned that the price of crab was likely to remain stable in the future in the face of increasing foreign competition.

---

even make an offer based on Macdonald Page's valuation of $1.09 million. Accordingly, there was a key man, and Mr. Gurley should have applied a discount to the value of the company on this basis.

In sum, just as with his failure to talk to more than one employee, Mr. Gurley's failure to conduct a site visit greatly diminished his objectivity and the information he had about the company.

### 3. Mr. Gurley Failed To Factor In The Fact That There Were No Noncompete Agreements With Key Employees.

There is no dispute that none of the employees of Portland Shellfish had non-compete agreements. Wetmore depo at 16: 11-25.[5] There is also no dispute of the fact that Mr. Holden's importance was extremely critical to the success of the company. Wetmore depo at 60: 5-9; MacEwan depo at 31: 14-25;[6] Holden depo at 18: 7-16; 22: 16-21.[7] Furthermore, Mr. Holden had expressly and steadfastly stated that he would not give a non-compete agreement under any circumstances and that he intended to compete. MacEwan depo at 43: 17 - 44: 2; MacEwan depo exhibit #17. What is more, the parties are in agreement that Mr. Holden's refusal to provide an employment agreement or a non-compete agreement had an extremely dramatic effect on the value of the business. This dramatic effect is demonstrated by, among other things:

(1) Mr. Wetmore's own actions admit that a non-competition agreement with Mr. Holden would have a large impact on the value of the company. Mr. Wetmore offered $1.25 million for Ms. Holden's forty-percent interest in the company – a price demonstrating that Mr. Wetmore assigned a total stock value at $3.125 million, but Mr. Wetmore's offer was conditioned on Mr. Holden either agreeing not to compete with Portland Shellfish or agreeing to a two-year employment contract. Complaint ¶ 17. However, without a noncompete agreement from Holden, Mr. Wetmore would not make any offer for Ms. Holdens' stock, including even making an offer based on Macdonald Page's valuation of $1.09 million. See MacEwan deposition exhibit #18; Wetmore depo at 59: 9-17; MacEwan depo at 58:19 – 59:3. Accordingly, Mr. Wetmore himself shows that presence of a non-competition agreement or employment agreement with Mr. Holden was worth more than $2 million.

(2) Mr. Wetmore agreed with Mr. Holden's statement that the absence of a noncompete agreement with Holden (and his brother-in-law) "would have a significant impact upon a valuation of the company and greatly diminish the value in a sale to a third party." Wetmore depo at 60: 14-18; MacEwan deposition exhibit #17.

---

[5] The Wetmore deposition transcript is attached to Defendant's Statement of Undisputed Material Facts as Exhibit C.
[6] The MacEwan deposition transcript is attached to Defendant's Statement of Undisputed Material Facts as Exhibit D.
[7] The Holden deposition transcript is attached to Defendant's Statement of Undisputed Material Facts as Exhibit A.

(3) Mr. Wetmore's counsel stated that no knowledgeable buyer ever would agree to purchase the company unless Mr. Holden was willing to agree to a noncompetition agreement. MacEwan deposition exhibit #16. He further states that Mr. Wetmore's "position was that a noncompetition agreement from Mr. Holden was a critical and material part of his willingness to purchase the shares." MacEwan depo at 29: 16-18. The reason for this was "[b]ecause of [Mr. Holden's] ability to compete with Portland Shellfish if he were not held to such a condition." MacEwan depo at 31: 17-18.

(4) Even Mr. Gurley acknowledges that it would "gut the value" of the company to value it with no non-competition agreement. Gurley depo at 145:21-146:3.

In contravention of the facts and reality of the case, Mr. Gurley did not take into account the fact that there were no covenants not to compete. Gurley depo at 151: 21-24. Rather, Mr. Gurley valued the company as though there were noncompete agreements. Gurley depo at 147: 3-7. Mr. Gurley tried to explain the reason that he did not factor in absence of covenants not to compete "[b]ecause it doesn't make sense within the purpose and the function of this provision." Gurley depo at 148: 6-10. Mr. Gurley stated that "the concept of the [shareholders'] agreement is to value an interest in the company as though the business were sold and if you had somebody lining up to compete with the business, it undermines the whole premise of the agreement. And so I didn't consider it to be relevant." Gurley depo at 139: 7-12.

There is no dispute, however, that in reality there was "somebody lining up to compete with the business," and that makes it particularly indefensible that Mr. Gurley refused to factor in the absence of a non-compete agreement. To make matters worse, there was absolutely no instruction given to Macdonald Page to disregard the absence of such a covenant not to compete in rendering its value conclusion. MacEwan depo at 56: 16-20. Rather, Macdonald Page was to value the company to reflect the reality of the situation, which included the fact that Mr. Holden would not give a noncompetition agreement and he was prepared to compete with the company.

Mr. Stephen Bravo, an expert retained by Macdonald Page, stated that Mr. Gurley's failure to consider the absence of non-compete agreements makes Gurley's appraisal completely

unreliable. In his report, Mr. Bravo summed this up as follows: "This factor has important implication for the valuation of the Company. The lack of such an agreement with Mr. Holden substantially reduces the value of the Company compared to what it would be if such a covenant existed. … I believe that his analysis is flawed because such an agreement does not exist." Bravo report at 8.

**4. Mr. Gurley Failed To Take Into Account The Fact That Portland Shellfish Was Involved In Litigation.**

As of the appraisal date, Portland Shellfish was involved in litigation in California. Wetmore depo at 65:24 - 66:1. The lawyers for Portland Shellfish, Verrill & Dana, considered it a significant piece of litigation which they took very seriously. MacEwan depo at 49: 18-24. Although Mr. Holden did not think that the litigation had merit, he took the litigation seriously, especially because "you never know what is going to happen when you go to court." Holden depo at 88: 20-21; 102:4. He states that the company was being sued "for $10,000,000 and if they had gotten anywhere close to getting anything like that it would have put us out of business." Holden depo at 102: 1-4. The lawsuit "drained a lot of money out in legal fees." Holden depo at 89: 6-7. Indeed, Verrill & Dana billed Portland Shellfish between $400,000 and $450,000 in attorneys' fees for the litigation, and Portland Shellfish paid $10,000 to settle one of the lawsuits. Holden depo at 102:16-20; 92: 6-13. The pending California litigation was serious enough that two of the three banks (Key Bank and Fleet) contacted for commercial financing for the Company refused to provide financing because of it. Holden depo at 82: 11-16.

Mr. Wetmore and his counsel were well aware that the pending litigation would have a significant effect on the valuation of the company. Indeed, Mr. Wetmore's counsel argued that the litigation would make it "impossible to achieve an accurate valuation of the Company" and he requested that the valuation be delayed until the "possible liability with the lawsuit" had resolved.

MacEwan depo exhibit #23. Nonetheless, the valuation was done while the litigation was pending, and there was no agreement that the litigation not be considered in arriving at the appraisal value. MacEwan depo at 54:25 - 55:4; Wetmore depo at 69: 8-13.

Despite the fact that there this serious litigation pending in California, Mr. Gurley failed to refer to the litigation anywhere in his report. Gurley depo at 69: 23 - 70: 1. Indeed, it appears that Mr. Gurley completed his report without any knowledge of the California lawsuit. Gurley depo at 70: 8-12. He could not recall anything he had done to check on the status of litigation against the company, and he had absolutely no information or recollection of the California lawsuit. Gurley depo at 68: 23 - 69:22. He further admitted that he did not take the California litigation into account in arriving at the company specific discount rate of 3.5 percent. Gurley depo at 91: 3-9.

Mr. Gurley's failure to consider the California litigation was a very serious omission. If he had been aware of the litigation, there can be no doubt that he would have arrived at a lower appraisal value. See Bravo report at 10.

## CONCLUSION

For the reasons discussed herein, Defendant requests that the Court enter an order excluding Mr. Gurley from testifying at trial. At a minimum, Defendant requests a hearing to test the reliability and fit of the opinions being offered by Mr. Gurley.

Dated at Portland, Maine this 7th day of September 2007.

*/s/Laurence H. Leavitt*
Laurence H. Leavitt
Attorney for Defendant

FRIEDMAN GAYTHWAITE WOLF & LEAVITT
6 City Center, P.O. Box 4726
Portland, ME 04112
Tel: (207) 761-0900
Fax: (207) 761-0186

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE
CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2007, I electronically filed Defendant's Motion to Exclude Plaintiff's Expert John Gurley with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to all registered counsel of record as follows:

James T. Kilbreth, Esq.
Peter S. Black, Esq.
Verrill & Dana, LLP
One Portland Square
Portland, ME 04112-0586
jkilbreth@verrilldana.com
pblack@verrilldana.com.

*/s/Laurence H. Leavitt*
Laurence H. Leavitt
Attorney for Defendant Macdonald, Page, Schatz, Fletcher & Company, LLC

FRIEDMAN GAYTHWAITE WOLF & LEAVITT
6 City Center, P.O. Box 4726
Portland, ME  04112
Tel: (207) 761-0900
Fax: (207) 761-0186